UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

EDDIE CRAWFORD,                        )
                                       )
          Plaintiff,                   )
                                       )          No. 2:11-cv-300
v.                                     )
                                       )          *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,       )
                                       )
          Defendant.                   )

## REPORT AND RECOMMENDATION

Plaintiff Eddie Crawford brought this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial

review of the final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying him disability insurance benefits ("DIB"). Plaintiff and Defendant have both

moved for summary judgment [Docs. 15, 17]. Plaintiff alleges the Administrative Law Judge

("ALJ") failed to properly evaluate Plaintiff's obesity in conjunction with his other impairments and

did not adequately consider the findings of a psychological examiner and a treating nurse

practitioner. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for summary

judgment [Doc. 15] be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 17]

be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for DIB on November 21, 2008, alleging disability as

of February 10, 2008 (Transcript ("Tr.") 165-68).[1] Plaintiff's claim was denied initially and upon

reconsideration and he requested a hearing before the ALJ (Tr. 88-89, 92-101). The ALJ held a

---

[1] Plaintiff filed a prior application for benefits and had a hearing before an ALJ on January 7, 2008 (Tr. 59-74). The ALJ issued his decision on February 9, 2008, and Plaintiff alleged disability in his new application beginning the date after the issuance of that decision (Tr. 75-87).

hearing on July 19, 2010, during which Plaintiff was represented by an attorney (Tr. 36-48). The ALJ issued his decision on August 18, 2010 and determined Plaintiff was not disabled because there were jobs in significant numbers in the economy that he could perform (Tr. 15-31). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 8-10). Plaintiff filed the instant action on October 6, 2011 [Doc. 2].

## II.    FACTUAL BACKGROUND

### A.    Education and Background

Plaintiff was 49 at the time of the hearing before the ALJ and had completed the eighth grade (Tr. 39, 63).[2] Plaintiff had previously worked as a construction laborer, a painter, and a truck driver (Tr. 39).

Plaintiff testified his back was his most serious physical problem and while he had an MRI, he did not recall if surgery was recommended as a result of the MRI (Tr. 40). Plaintiff experienced stiffness in his back with pain radiating to both legs (Tr. 40-41). Plaintiff was up and down all day because of his back pain and said he had no strength (Tr. 44). Plaintiff testified that after having rotator cuff surgery, he also had problems working his hands and, while he could still grip, he had no strength (Tr. 41).

Plaintiff did not think he could work a light duty job because he was not in good health and was very weak; he also stated a new doctor had performed biopsies to diagnose a problem with his liver (Tr. 41-42). Plaintiff testified he had hepatitis C that was spreading through his body and he was sick to his stomach and fatigued all the time (Tr. 42). Plaintiff was not sure how he had

---

[2] This is what Plaintiff testified to at the hearing and stated to various examiners, but in his disability report, it says Plaintiff completed the tenth grade (Tr. 187, 300, 401).

contracted hepatitis C and only found out he had it after experiencing severe weakness and consulting with the new doctor (Tr. 43).

Plaintiff lived with his ex-wife and seldom drove (Tr. 43). He was unable to hunt or fish or take part in other hobbies any longer and generally only watched TV; he stayed close to home and did not socialize with friends (Tr. 43-44). Plaintiff had problems paying attention to the TV (Tr. 44). Plaintiff testified a case management worker from the mental health center had been coming to his house every couple of weeks for over a year (Tr. 44-45).

### B. Vocational Expert Testimony

The ALJ solicited the testimony of vocational expert Donna Bardsley ("VE") during the hearing (Tr. 45). The ALJ first asked VE to consider an individual with Plaintiff's height, weight, education, and work background who could perform light work but had hepatitis C, had to avoid overhead lifting, and had an emotional disorder with restrictions consistent with Dr. Lawhon's report (Tr. 45). VE testified that an individual with these restrictions could work as a general laborer, sales clerk, cashier, hand packager, sorter, assembler, or inspector, with approximately 9,000 jobs regionally and 11,000,000 nationally (Tr. 45-46). The ALJ next asked if the individual could perform the jobs if the individual could not tolerate an eight-hour workday; VE testified that all the jobs would require an eight-hour day (Tr. 46). Counsel for Plaintiff asked VE if jobs would be available for an individual with the limitations outlined in Dr. Gaines' assessment, and VE testified that no jobs would be available for someone with those limitations (Tr. 47). Finally, VE testified that no jobs would be available if Plaintiff was limited to the extent to which he testified (Tr. 47).

### C. Medical Records

### 1.    Physical

Plaintiff followed with doctors and nurse practitioners at Appalachian Medical Center starting in 2007, and was seen for check-ups throughout 2007, 2008, 2009 and into 2010. At these visits, his back pain, neck pain, chronic obstructive pulmonary disease ("COPD"), diabetes, hypertension, and hypothyroidism were well controlled (Tr. 236-79, 343-56, 377-96). On November 12, 2007, an MRI of Plaintiff's lumbar spine revealed bilateral facet arthropathy at the L5-S1 level, but no significant stenosis (Tr. 283). On December 26, 2008, nurse practitioner David Stout assessed Plaintiff's range of motion, which was reduced in both shoulders and slightly reduced in the cervical and lumbar spines (Tr. 234-35).

Dr. Samuel Breeding performed a physical examination of Plaintiff on February 2, 2009 (Tr. 299-301). Dr. Breeding noted Plaintiff's past MRIs and that Plaintiff stated his back pain had been getting worse, necessitating a cane (Tr. 299). Plaintiff reported difficulty with prolonged sitting, standing, or walking and had to stop and rest after walking a short distance (Tr. 300). Plaintiff stated he still had pain and decreased range of motion in his shoulder due to the rotator cuff surgery; Plaintiff also stated he started becoming depressed and nervous after being out of work (Tr. 300). Dr. Breeding noted Plaintiff's gait was slow, but his station was normal and Plaintiff could walk without the cane (Tr. 300). Dr. Breeding noted Plaintiff had a decreased range of motion in his left shoulder, could not extend back, and had a negative straight leg raise test (Tr. 301). Dr. Breeding opined Plaintiff could lift 15 pounds occasionally, could sit for four to six hours in an eight-hour day and could stand two to four hours in an eight-hour day, but should sit or stand as needed for comfort, and may have difficulty reaching overhead (Tr. 301).

Dr. Robert T. Doster compared the ALJ's prior decision with the current decision on March 13, 2009 and opined no significant change in Plaintiff's condition had occurred since the prior

decision (Tr. 322-25). Dr. Doster also filled out a physical residual functional capacity assessment, in which he opined Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and was limited in his ability to push and/or pull to only frequent in his left upper extremity (Tr. 327). Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 328). Plaintiff could only frequently lift overhead due to his rotator cuff surgery and degenerative disc disease of the cervical spine (Tr. 329). Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to possible chronic bronchitis (Tr. 330). Dr. Doster noted the assessment of nurse practitioner Bob Reynolds which assessed Plaintiff as having less than sedentary work abilities but stated the opinion was given little weight because he was a nurse practitioner (Tr. 332). Dr. Doster stated Plaintiff was partially credible because he exhibited pain behavior such as using a cane (Tr. 333). Dr. Carolyn Parrish affirmed Dr. Doster's assessment on August 18, 2009 (Tr. 358).

Plaintiff began following with Dr. Shelton Hager at Holston Medical Group in March 2010 and was assessed as having lower back pain, hypertension that was under control, COPD, thyroid disorder, diabetes mellitus, depression, and generalized anxiety disorder (Tr. 428-29). An ultrasound of Plaintiff's abdomen on April 7, 2010 showed a fatty liver, no definite solid masses in the liver and a gallstone; during a visit on April 20, 2010, test results were discussed and a hepatitis viral panel was ordered (Tr. 424-27). On April 27, 2010, Plaintiff presented for an office visit and the hepatitis C test was positive (Tr. 421-23). Plaintiff had an office visit with Dr. Manoj Srinath in gastroenterology on May 17, 2010 and complained of chronic heartburn and dysphagia; Dr. Srinath ordered an upper GI endoscopy with dilation (Tr. 418-20). Plaintiff had monthly check up

visits with Dr. Hager in May and June 2010 (Tr. 414-17).[3]

## 2. Mental

Plaintiff submitted to a psychological evaluation with Jeff Davis, MA on January 4, 2008 (Tr. 363-67). Plaintiff reported that he sought treatment for anxiety and depressive symptoms but did not find the therapist to be therapeutic; he was taking Xanax for his symptoms as prescribed by his primary care physician (Tr. 363). Plaintiff described days in which his depression was so severe he could not do anything and stated the symptoms had been significant for about a year (Tr. 364). Plaintiff reported sitting and lying around the house in pain, decreased social activities, and panic attacks that were alleviated by Xanax (Tr. 364). Mr. Davis noted that Plaintiff did not seem to be making the situation appear worse than it was and seemed to have self-esteem issues (Tr. 364). Plaintiff's full scale IQ score was 63, but mild mental retardation was ruled out because there was no background evidence of a constant condition starting before age 18 (Tr. 365-66). Mr. Davis diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood, but ruled out major depressive disorder and panic disorder because some of the depressive symptoms might be medically based due to his physical conditions (Tr. 366-67). He assigned Plaintiff a Global Assessment of Functioning ("GAF")[4] score of 30 (Tr. 366).

Mr. Davis completed an addendum after reviewing Plaintiff's school records and medical records on January 14, 2008 (Tr. 361-62). Mr. Davis opined the records were inconclusive to

---

[3] Additional evidence was submitted to the Appeals Council about an MRI of Plaintiff's lumbar spine on November 29, 2010, which revealed minimal disc bulging at L4-L5 and L5-S1 with no herniation or stenosis and prominent right L4-L5 and L5-S1 facet osteoarthritis chronic in appearance with no secondary foraminal narrowing (Tr. 443).

[4] A GAF score of 21 to 30 indicates "behavior considerably influenced by delusions or hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas." *Long v. Comm'r of Soc. Sec.*, No. 2:11-cv-00343, 2012 WL 2156713, at *3 n. 5 (S.D. Ohio June 13, 2012).

confirm or deny the previous diagnoses, particularly mild mental retardation, because his mental abilities may have declined due to anxiety and depressive symptoms (Tr. 362). A further addendum on February 26, 2008 noted Plaintiff's scores on another test were in the extremely low range, but the scores did not alter Mr. Davis' earlier diagnoses (Tr. 360).

Plaintiff submitted to a psychological evaluation by Dr. Steven Lawhon on January 20, 2009 (Tr. 294-97). Plaintiff stated he was seeking disability due to his back, neck, and nerves, and walked with a cane (Tr. 294). Dr. Lawhon noted Plaintiff was confused and disoriented during the evaluation and appeared to be overly sedated; he was also moody, irritable, and easily frustrated (Tr. 295). Plaintiff reported a history of alcohol abuse and stated he did not cook, wash dishes, go to the store, go to church, do laundry, or engage in other daily activities (Tr. 295-96). Plaintiff did state he watched television and reported he wanted to be left alone when he was having a bad day (Tr. 296). Plaintiff had previously enjoyed spending time with friends, but now did so rarely (Tr. 296). Dr. Lawhon noted Plaintiff appeared to be moderately depressed and stated he was in chronic pain (Tr. 295). Dr. Lawhon opined Plaintiff's intellectual functioning was in the low average range (Tr. 296). Dr. Lawhon diagnosed Plaintiff with depression, noted he experienced psychosocial stressors due to health problems, and assigned him a GAF score of 58[5] (Tr. 296). Dr. Lawhon opined Plaintiff was moderately limited in his ability to sustain concentration and persistence, mildly to moderately limited in work adaptation, and not significantly limited in social interaction or his ability to understand and remember (Tr. 297).

Dr. Mason Currey reviewed Plaintiff's file and completed a psychiatric review technique

---

[5] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

form and a mental residual functional capacity assessment on February 5, 2009 (Tr. 306-21). Dr. Currey noted Plaintiff's diagnosis of depression due to medical reasons and opined Plaintiff was moderately limited in the following abilities: maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, and responding appropriately to changes in the work setting (Tr. 309, 319-20). Plaintiff was not significantly limited in other areas (Tr. 319-20). Dr. Currey noted Plaintiff would have some but not substantial difficulty in the areas in which he was moderately limited and could adapt to infrequent change (Tr. 321). Dr. Andrew Phay reviewed Dr. Currey's assessment and affirmed it on August 18, 2009 in the absence of any new mental evidence (Tr. 357).

Records from Frontier Health indicate Plaintiff attended therapy sessions in late 2006 through April 2007 (Tr. 404-05). On April 23, 2007, Plaintiff was diagnosed with adjustment disorder, alcohol dependence in remission, and cannabis dependence in remission; his current GAF was 58 which was also his highest and lowest in the last six months (Tr. 405). Plaintiff self-referred on June 29, 2009 and reported severe depression, symptoms of depression since 2005, and problems with daily living (Tr. 406-07). Plaintiff was seen by Dr. Charles Gaines on July 8, 2009, and Dr. Gaines noted Plaintiff had severe psychomotoric retardation, his mood was dysphoric, his affect was flat, and his speech was monotone (Tr. 401). Plaintiff's intelligence appeared average and he did not seem to be psychotic (Tr. 401-02). Dr. Gaines diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychosis, stated that in his opinion, Plaintiff was not employable, and assigned a GAF of 55-60 (Tr. 402). Plaintiff returned for a medication review on October 8, 2009 (Tr. 399). Plaintiff reported he had been depressed and was isolating himself at

home; he was irritable and had low energy and was having problems sleeping (Tr. 399). Plaintiff returned on January 7, 2010, and he reported a depressed and worried mood with problems sleeping; one medication was changed and the dosage on another was increased (Tr. 398). On April 1, 2010, Plaintiff reported his mood was good until midafternoon, when he would become depressed; his medication was again increased (Tr. 397).

Dr. Gaines filled out a mental impairment questionnaire on June 25, 2010 (Tr. 431-35). Dr. Gaines noted he had treated Plaintiff about every three months for the last year and diagnosed him with major depressive disorder, recurrent and severe without psychosis (Tr. 431). Dr. Gaines reported Plaintiff's current GAF was 55-60 and his highest in the last year was 55-60 (Tr. 431). Plaintiff's symptoms included mood disturbance, social withdrawal, blunt, flat or inappropriate affect, decreased energy, loss of interests, retardation and suicidal ideation or attempts (Tr. 432). In response to a question seeking the clinical findings supporting the severity of mental impairments, Dr. Gaines wrote severe psychomotoric retardation, flat affect, and monotone voice (Tr. 432). Dr. Gaines opined Plaintiff was not a malingerer and that his impairments were consistent with his symptoms and noted that Plaintiff's response to medication had been poor (Tr. 432). Dr. Gaines further opined Plaintiff's prognosis was poor, that his impairment had lasted or was expected to last at least 12 months, and that Plaintiff's symptoms were exacerbating his physical condition (Tr. 433). Dr. Gaines opined Plaintiff was not employable and would have difficulty working at a regular job on a sustained basis (Tr. 434). Dr. Gaines opined Plaintiff had moderate restriction in his activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies in concentration, persistence, or pace, and had repeated (three or more) episodes of deterioration or decompensation (Tr. 434).

## III. ALJ'S FINDINGS

### A. Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following

a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to

show the extent of his impairments, but at step five, the Commissioner bears the burden to show that,

notwithstanding those impairments, there are jobs the claimant is capable of performing. *See*

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B. ALJ's Application of the Sequential Evaluation Process

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial

gainful activity since February 10, 2008, his alleged onset date, through his date last insured,

September 30, 2009 (Tr. 21). At step two, the ALJ found Plaintiff had the following severe

impairments: history of left rotator cuff repair, degenerative joint disease, degenerative disc disease,

hepatitis C, and an emotional disorder (Tr. 21). The ALJ determined these impairments were severe

because they resulted in significant vocational restrictions (Tr. 21). The ALJ discussed Plaintiff's other physical conditions--hypertension, respiratory problems, hypothyroidism, and diabetes--but found them to be non-severe because they were either well managed or were not of the frequency and severity that would indicate a severe impairment (Tr. 21-23).

At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 23). The ALJ noted that he considered Listings 1.00, 3.00, 4.00, and 12.00 and discussed in length his consideration of paragraphs B and C of Listing 12.04 and 12.06 and paragraph C of Listing 12.05 (Tr. 23-26). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work that took into consideration limitations due to hepatitis C, did not require overhead reaching, and took into consideration the emotional limitations outlined in Dr. Lawhon's assessment, namely, moderate limitations with sustaining concentration and persistence and mild to moderate limitations with work adaptation (Tr. 26).

At step four, the ALJ found Plaintiff was unable to perform any of his past relevant work (Tr. 29). At step five, the ALJ noted Plaintiff was age 48, a younger individual, as of the date last insured (Tr. 30). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 30). This finding led to the ALJ's determination that Plaintiff was not under a disability from February 10, 2008, the alleged onset date, through September 30, 2009, the date last insured (Tr. 31).

## IV.    ANALYSIS

Plaintiff presents two arguments. First, he argues the ALJ failed to properly consider his obesity in combination with his other impairments, as directed by the Social Security rulings

("SSR").  Second, Plaintiff asserts the ALJ did not adequately consider and evaluate the findings of a psychological examiner and a treating nurse practitioner.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight."  *Id.* (internal quotes omitted).  If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings.  *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility.  *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No.

2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B.    Plaintiff's Obesity

Plaintiff argues the ALJ failed to acknowledge his obesity in contravention of the applicable SSR, failed to determine whether his obesity was a severe impairment, and failed to consider the effects of obesity either separately or in combination with Plaintiff's other medical impairments [Doc. 16 at PageID#: 81]. The Commissioner asserts Plaintiff's characterization of the SSR is misplaced because the SSR merely says that obesity *may* increase the severity of other limitations but, in any event, the Commissioner argues that because Plaintiff did not provide evidence that his obesity caused functional limitations, the ALJ did not err in failing to discuss obesity [Doc. 18 at PageID#: 100-01]. The Commissioner argues that Plaintiff did not allege any problems with obesity during his hearing or in any of the forms submitted to the Social Security Administration [*id.* at PageID#: 101]. Moreover, the Commissioner asserts there was no diagnosis of obesity in the relevant time period and no indication that Plaintiff's obesity exacerbated his conditions [*id.*].

Plaintiff listed many conditions which prevented him from working in his application for benefits, but did not specifically mention obesity (Tr. 183). The ALJ considered all the conditions listed by Plaintiff, but did not specifically consider obesity (*see* Tr. 21-22). To qualify as a severe impairment at step two of the ALJ's analysis, an impairment must "significantly limit your physical or mental ability to do basic work activities. . . . " 20 C.F.R. § 404.1520(c). The SSR referenced

by Plaintiff states that obesity is a severe impairment when, "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02-01p, 2000 WL 628049, at *4. As the United States Court of Appeals for the Sixth Circuit has previously noted, however, "Social Security Ruling 02-01p does not mandate a particular mode of analysis" for the ALJ to consider when a claimant alleges obesity; instead, "[i]t only states that obesity, in combination with other impairments, 'may' increase the severity of other limitations." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006).

There is no evidence in the record that Plaintiff was ever diagnosed with obesity, and Plaintiff did not testify to his weight causing problems at the hearing; therefore, the only evidence in the record which would speak to obesity are Plaintiff's height and weight measurements from various doctor visits.[6] There are no doctor notes indicating that Plaintiff's obesity increased the severity of his conditions, and no notes in any medical opinion that his obesity caused increased work-related limitations; in fact, it does not appear that Plaintiff's treating nurse practitioners ever advised him to lose weight to help with his symptoms from various conditions, although there are

---

[6] From June 2007 through the end of 2007, Plaintiff's weight ranged from 234 to 245 (Tr. 261-73). Plaintiff's weight ranged from 248 in the beginning of 2008 to 259 at the end (Tr. 236-60). In August 2008, Plaintiff's treating nurse practitioners began calculating the body mass index ("BMI") in their notes, and indicated Plaintiff's height was either 70 or 72 inches (Tr. 246-47). Plaintiff's first BMI was calculated using a height of 72 inches and his BMI was 33, but after late August 2008, a height of 70 inches was used in all BMI calculations, and Plaintiff's BMI was around 36 or 37 through 2008 (Tr. 236-47). In 2009, Plaintiff's weight started at 259, increased to 271 later in the year, and was back to 261 at the end of the year; Plaintiff's BMI ranged from a low of 36.15 to a high of 38.88 (Tr. 346-55, 384-96). In 2010, Plaintiff's weight went from 258 and a BMI of 37.02 to 269 in March 2010, but no BMI was calculated for Plaintiff's last two visits in the record (Tr. 378-82). SSR 02-1p states that the NIH has identified a BMI of 30-34.9 as "Level I" obesity, and BMIs of 35.0-39.9 as "Level II," but notes that "[t]hese levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss." *See* SSR 02-01p, 2000 WL 628049, at *2.

notes in those records that the nurse practitioners extensively encouraged him to stop smoking. Therefore, there is no indication in the record that Plaintiff was diagnosed as being obese, that his obesity was causing significant work limitations, or that his obesity was exacerbating his other conditions to cause such limitations.

The Sixth Circuit recently encountered similar circumstances in *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011), where the claimant "did not list obesity as one of her impairments, or list it as one of her difficulties on any paperwork . . . she did not present evidence from any physician that described her as obese, much less gave an opinion that her weight imposed additional limitations upon or exacerbated her other conditions . . . it does not appear that evidence existed regarding her obesity that the ALJ should have considered." *Id.* at 416. As noted above, the only evidence as to Plaintiff's obesity are height and weight and BMI calculations from various treatment notes. Even if the ALJ noted these calculations and determined Plaintiff was obese, it would still not establish that the obesity was severe enough to exacerbate his conditions or render him disabled. *See Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852, 857-58 (6th Cir. 2003) (finding the ALJ had no obligation to address the claimant's obesity when "the ALJ never received evidence suggesting [claimant] or her doctors regarded her weight as an impairment. . . and [claimant] provided no evidence that obesity affected her ability to work.").

As such, I **FIND** the evidence in the record did not support a determination that Plaintiff's obesity was a severe impairment and therefore **CONCLUDE** the ALJ did not err in failing to include obesity as a severe impairment and failing to discuss obesity separately or in combination with Plaintiff's other impairments.

C.     **ALJ's Consideration of Mr. Davis's Opinion**

Plaintiff next argues the ALJ failed to properly consider the opinion of Jeff Davis when the

ALJ assessed his mental impairments and determined that Plaintiff did not meet the requirements of Listing 12.05C [Doc. 16 at PageID#: 82-83]. Plaintiff asserts his IQ score and school records were nearly sufficient to meet the requirements of the Listing based on Mr. Davis's opinion, but the ALJ failed to mention either the IQ scores or Plaintiff's school records in his analysis [*id.* at PageID#: 84]. Plaintiff argues the ALJ also failed to consider other evidence supporting Mr. Davis's assessment, such as Plaintiff's mood and behavior observed by Dr. Lawhon, and improperly stated Plaintiff completed the 12th grade when he only finished 8th grade [*id.* at PageID#: 84-85]. Plaintiff contends Mr. Davis's findings should have been credited and the ALJ should have considered the applicable evidence in making his determination as to Listing 12.05C [*id.* at PageID#: 85-86].

The Commissioner argues Plaintiff never alleged he was disabled due to an intellectual impairment or mental retardation at the hearing or in the forms submitted to the Social Security Administration and instead focused primary on his physical impairments [Doc. 18 at PageID#: 102]. The Commissioner contends the ALJ adopted Dr. Lawhon's opinion even if he did not discuss specific findings made by Dr. Lawhon; Dr. Currey's opinion, to which the ALJ gave some weight, did not reveal any significant intellectual deficiencies; Dr. Gaines' opinion similarly did not identify any significant intellectual problems; and there was no evidence of "significant subaverage general intellectual functioning" manifesting during Plaintiff's developmental period in the record, including no such evidence in Mr. Davis's opinion [*id.* at PageID#: 102-05]. The Commissioner asserts Mr. Davis did not diagnose Plaintiff with mental retardation because he could not establish a constant condition from an early age, even after reviewing Plaintiff's school records [*id.* at PageID#: 105]. The Commissioner argues the ALJ accommodated all of Plaintiff's current limitations by incorporating moderate limitations into his RFC determination and properly adopted Dr. Lawhon's opinion that Plaintiff was functioning in the "low average" range [*id.* at PageID#: 106]. The

Commissioner further argues Plaintiff was able to work in various jobs with no apparent intellectual difficulties for years, providing more support for the ALJ's explanation that Mr. Davis's opinion was not supported by the record as a whole [*id.* at PageID#: 107]. Finally, the Commissioner points out that Mr. Davis's opinion is not one by an acceptable medical source because Mr. Davis only qualifies as an "other source" and, therefore, his opinion cannot establish the existence of a medically determinable impairment; furthermore, even if the ALJ had accepted Mr. Davis's opinion, Plaintiff would still not have met the requirements of Listing 12.05C [*id.* at PageID#: 108-09].

The ALJ stated that the criteria of Listing 12.05C were not met because Plaintiff did not have a valid IQ score of 60 through 70 and a physical or other mental impairment resulting in significant work-related limitation of function; the ALJ went on to state that "[t]here has been no showing of a sub-average IQ or intellectual ability to perform work-related functions" (Tr. 24). The ALJ noted Mr. Davis's opinion but afforded it little weight because it was not supported by the record as a whole (Tr. 25). Instead, the ALJ adopted the opinion of Dr. Lawhon, which stated Plaintiff was functioning in the low average range and opined Plaintiff had, at most, moderate limitations in mental work-related activities (Tr. 25, 295-97). Although Plaintiff argues Dr. Lawhon noticed behaviors which spoke to Defendant's intellectual deficiencies, Dr. Lawhon noted Plaintiff seemed confused and disoriented because he appeared to be overly sedated and stated he had taken medication prior to the evaluation; otherwise, Dr. Lawhon noted Plaintiff was rational and oriented to person, place and situation, did not have hallucinations or delusions, and had a GAF score of 58 (Tr. 294-97). Dr. Lawhon's opinion, as compared to Mr. Davis's assessment which assigned Plaintiff a GAF of 30, is more in line with Plaintiff's somewhat sporadic complaints of mental health

symptoms and generally conservative treatment from primary care providers.[7]

Given the evidence in the record as to Plaintiff's mental impairments, I **FIND** the ALJ's decision to adopt the opinion of Dr. Lawhon was supported by substantial evidence because it was supported by the record and I **FIND** the ALJ did not err in rejecting Mr. Davis's opinion as inconsistent with the record as a whole. Moreover, because Mr. Davis is not an acceptable medical source and is instead an "other source," the ALJ was not required to accept Mr. Davis's opinion or assign it any controlling weight, as the regulation states the ALJ "*may* also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work." *See* 20 C.F.R. § 404.1513(d) (emphasis added). Accordingly, I **CONCLUDE** the ALJ's rejection of Mr. Davis's opinion was supported by substantial evidence.

As the Commissioner points out, even if the ALJ had adopted Mr. Davis's opinion, it would not have provided sufficient support for Plaintiff's argument that he met the requirements of Listing 12.05C. Listing 12.05 states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; . . . .

20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.05. A threshold requirement, therefore, is that Plaintiff exhibit "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . before age 22." Mr. Davis

---

[7] Dr. Gaines also noted Plaintiff's intelligence appeared to be average based on vocabulary and fund of knowledge, and he assigned Plaintiff a GAF of 55-60 (Tr. 401-02).

stated, after reviewing Plaintiff's school and medical records, that he continued to rule out mild mental retardation as a diagnosis for Plaintiff (Tr. 361-62). Mr. Davis stated Plaintiff's academic scores in school were above his current intellectual abilities, which generally scored as borderline or extremely low, but that it was likely "that over time his mental abilities have declined especially with concurrent anxiety and depressive symptoms" (Tr. 362). Mr. Davis noted that in order to confirm his diagnoses, he would need background information from family and friends about Plaintiff's functioning as a youth (Tr. 362). Therefore, even though Plaintiff's intellectual abilities may have currently been significantly deficient, Mr. Davis could not unequivocally determine that Plaintiff had such significant intellectual impairments in his youth, even after reviewing school records. Plaintiff reported to Mr. Davis that he left school because his mother could no longer afford school clothes and he had to go to work, not because of his intellectual abilities (Tr. 364). Moreover, Plaintiff worked in construction, as a janitor and truck driver, and as a painter for a number of years without any apparent intellectual difficulties and left his last job due to injury (Tr. 183-84).

Without satisfying the threshold requirement that he manifested significant subaverage intellectual functioning with deficits in adaptive functioning prior to age 22, Plaintiff could not meet Listing 12.05C even if he had the requisite IQ score and other physical or mental impairment. Had the ALJ adopted some or all of Mr. Davis's opinion, he might have reached the conclusion that Plaintiff had a qualifying IQ score and other impairments to satisfy the additional requirements, but Mr. Davis's opinion--and the evidence in the record--was equivocal on Plaintiff's ability to meet the first requirement of Listing 12.05C, and adoption of Mr. Davis's opinion would not have altered the ALJ's conclusion that Plaintiff did not meet Listing 12.05C. Therefore, I **CONCLUDE** the evidence in the record does not support a conclusion that Plaintiff would have met Listing 12.05C.

## D.     ALJ's Consideration of Mr. Reynolds' Opinion

As to his physical impairments, Plaintiff contends the ALJ failed to acknowledge or evaluate the opinion of nurse practitioner Bob Reynolds in July 2009 [*id.* at PageID#: 86]. Plaintiff asserts that even if Mr. Reynolds is not an acceptable medical source, the ALJ was required to evaluate the evidence [*id.* at PageID#: 87-88]. The Commissioner points out that this opinion was actually from July 2007, not 2009, and was discussed and rejected by the ALJ in his prior decision on Plaintiff's claims [Doc. 18 at PageID#: 99]. The Commissioner argues the ALJ did not have to address this opinion again and the ALJ's RFC as to Plaintiff's physical impairments was otherwise supported by substantial evidence [*id.*].

The date on Mr. Reynolds' opinion is July 16, 2007, and it does appear the ALJ discussed the opinion in his prior decision (Tr. 85, 292). A social security claimant is barred from relitigating an issue that has already been determined. *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997). I **FIND** it was not error for the ALJ to decline to discuss this opinion again and, after reviewing all of Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

## V.     CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[8]

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

(1)     Plaintiff's motion for summary judgment [Doc. 15] be **DENIED**.

(2)     The Commissioner's motion for summary judgment [Doc. 17] be **GRANTED**.

(3)     The Commissioner's decision denying benefits be **AFFIRMED**.

s/ *Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE